STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, V. GARY D. DENTON, RESPONDENT.
604 N.W.2d 832

Filed January 21, 2000. No. S-98-674.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

Gary D. Denton, pro se.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.
Formal charges were filed by the Nebraska State Bar Association (NSBA) against Gary D. Denton, a member of the NSBA. For the reasons set forth below, we conclude that Denton should be disbarred.

## BACKGROUND
In January 1997, Denton's former client, K.J., filed a letter of complaint with the NSBA. K.J. alleged that she and Denton engaged in sexual relations during the time of their attorney-client relationship. In 1994 and 1995, Denton represented K.J. in a divorce proceeding involving a child custody dispute. Although K.J. was awarded temporary custody of the children, she lost permanent custody after Denton failed to call two potentially significant witnesses to testify about K.J.'s mental health and past behavior.

In June 1998, the NSBA filed formal charges against Denton for allegedly violating the attorney's oath of office and the following provisions of the Code of Professional Responsibility:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice. . . .

(6) Engage in any other conduct that adversely reflects on his or her fitness to practice law.

. . . .

DR 2-110 Withdrawal from Employment.

. . . .

(B) Mandatory withdrawal.

A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:

. . . .

(2) The lawyer knows or it is obvious that his or her continued employment will result in violation of a Disciplinary Rule.

. . . .

DR 5-101 Refusing Employment When the Interests of the Lawyer May Impair the Lawyer's Independent Professional Judgment.

(A) Except with the consent of his or her client after full disclosure, a lawyer shall not accept employment if the exercise of the lawyer's professional judgment on behalf of a client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.

. . . .

DR 7-101 Representing a Client Zealously.

(A) A lawyer shall not intentionally:

. . . .

(3) Prejudice or damage his or her client during the course of the professional relationship, except as required under DR 7-102(B).

Denton denied the allegations contained in the formal charges. Thereafter, a referee was appointed pursuant to Neb. Ct. R. of Discipline 10(J) (rev. 1996). In lieu of repeating testimony, the entire record made before the Committee on Inquiry of the Sixth Disciplinary District (Committee) was submitted to the referee. Sometime in early October, however, the NSBA dis-

covered new evidence that was not introduced to the Committee. This evidence directly contradicted the evidence that Denton presented to the Committee. The new evidence consisted of a statement by another of Denton's former clients, Jane Doe, that she, too, had engaged in sexual activity with Denton during his representation of her. This evidence was adduced to rebut Denton's claim that he was impotent. Jane Doe submitted an affidavit which stated that Denton was able to achieve an erection at the time of their sexual contact. The referee, therefore, held a hearing in February 1999 to take additional testimony. The referee heard testimony from K.J., the original complainant against Denton, and Jane Doe, the source of the NSBA's newly discovered evidence. The referee also heard additional testimony from Denton, Denton's wife, and one of Denton's friends.

In addition, the evidence presented by the NSBA consisted of a tape-recorded conversation between Denton and K.J. When K.J. confided in another attorney regarding her problems with Denton, she was encouraged to get corroborative evidence of the sexual relationship. She did so by secretly tape recording a conversation between her and Denton in September 1996. Although Denton made an implausible attempt to connect the taped conversation with K.J.'s divorce proceeding and tried to explain his responses by saying that he did not know what K.J. was talking about, the taped conversation convincingly shows that Denton and K.J. engaged in sexual relations.

Based on the record made before the Committee, the testimony before the referee, and the transcript of the recorded conversation, the referee found by clear and convincing evidence that Denton had violated several provisions of the Code of Professional Responsibility. Thereupon, the referee recommended that Denton be suspended from the practice of law for 2 years, during which time he be required to participate in gender sensitivity courses and to continue counseling for depression and anxiety.

## STANDARD OF REVIEW

■ Under existing case law, we are limited in our review to examining only those items to which the parties have taken exception. *State ex rel. NSBA v. Schmeling*, 247 Neb. 735, 529 N.W.2d 799 (1995).

■ Under rule 10(L), this court may, in its discretion, consider the referee's findings as final and conclusive. See, *State ex rel. NSBA v. Schafer*, 227 Neb. 449, 418 N.W.2d 228 (1988); *State ex rel. Nebraska State Bar Assn. v. Blanchard*, 179 Neb. 452, 138 N.W.2d 804 (1965).

## REFEREE'S FINDINGS

### SEXUAL RELATIONSHIP WITH CLIENT

Based on the record made before the Committee, the testimony presented to the referee, and the transcript of the recorded conversation between Denton and K.J., the referee determined that "there was clearly some sort of sexual relationship engaged in between [K.J. and Denton] during the course of [Denton's] representation." Although Denton adamantly denied having any sexual contact whatsoever with K.J., the referee noted:

> This is more than a "he said/she said" confrontation. In addition to [K.J.'s] extensive and graphic testimony before both the Committee on Inquiry and the hearing before me, there is the tape recording. [Denton's] explanations for his statements on the tape recording are neither convincing nor plausible. . . . I saw and heard [K.J.] testify. I saw and heard [Jane Doe] testify. . . . I find that, despite any past problems either of them may have experienced, the testimony of [K.J. and Jane Doe] regarding [Denton] was credible.

Next, the referee determined whether Denton's solicitation of and engagement in a sexual relationship with a client constituted a violation of the Code of Professional Responsibility. In consideration of the facts that Denton represented K.J. in a contested custody proceeding and was well aware of K.J.'s psychological and psychiatric history, the referee found by clear and convincing evidence that Denton's conduct violated Canon 1, DR 1-102(A)(5) (conduct that is prejudicial to administration of justice); DR 1-102(A)(6) (conduct that adversely reflects on his or her fitness to practice law); and Canon 7, DR 7-101(A)(3) (lawyer shall not intentionally prejudice or damage client during course of professional relationship except as required under DR 7-102(B)).

## FAILURE TO CALL WITNESSES AT TRIAL

The referee also found that Denton's conduct presented ethical violations beyond the sexual relationship with his client. The referee determined that Denton neglected to call two potentially significant witnesses on K.J.'s behalf *because of* their knowledge of the sexual relationship between K.J. and Denton. The referee concluded that by so doing, Denton put his own self-interest and protection above that of his client and thereby committed further violations of the Code of Professional Responsibility.

In preparation for the divorce proceeding, Denton asked K.J. about potential witnesses. She gave him several names, including Daniel L. Scharf, Ph.D., and Gary Cotton. Scharf, a licensed psychologist, counseled K.J. throughout the divorce proceedings. Cotton, a counselor at the Panhandle Mental Health Center, was a close friend and confidant of K.J.'s. At some point prior to trial, K.J. informed both Scharf and Cotton about her involvement with Denton. Although Scharf and Cotton had potentially significant testimony to offer, Denton neglected to contact either of them. Denton argues that he did not call them as witnesses because their testimony could have allowed K.J.'s husband to raise the question of her mental health at trial.

Although counsel for K.J.'s husband agreed at the pretrial conference not to raise the question of K.J.'s mental health as an issue at trial, opposing counsel did, in fact, bring up K.J.'s mental health during cross-examination. Counsel for K.J.'s husband testified before the Committee that he did not intend to raise the question of K.J.'s mental health, but, rather, he intended to impeach her. Nevertheless, opposing counsel's cross-examination of K.J. raised the issue of her mental health, and Denton failed to call either Scharf or Cotton to rehabilitate her status. Thereafter, the court awarded permanent custody of K.J.'s children to her husband.

The referee noted that in K.J.'s situation, which seemed to be a "typical" divorce trial where child custody was an issue, Denton should have contacted K.J.'s counselors. Although the referee acknowledged the difficulty of second-guessing an attorney's trial strategy after the fact, he found that there was more than an appearance of impropriety and that Denton's profes-

sional judgment was affected by his sexual relationship with K.J. The referee found by clear and convincing evidence that despite the potential significance of testimony by Scharf and Cotton, Denton did not contact or call either of them *because of* their knowledge of the sexual relationship between Denton and K.J. In addition to the obvious detrimental impact that the sexual relationship itself had on K.J., the referee noted Denton's failure to adequately represent his client. Due to the fact that Denton placed his own self-interest and protection above that of his client, which ultimately led or at least contributed to K.J.'s losing custody of her children, the referee found by clear and convincing evidence that Denton's conduct violated DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102(A)(5) (conduct that is prejudicial to administration of justice); DR 1-102(A)(6) (conduct that adversely reflects on his or her fitness to practice law); Canon 2, DR 2-110(B)(2) (lawyer shall withdraw from employment if lawyer knows or it is obvious that continued employment will result in violation of disciplinary rules); and Canon 5, DR 5-101(A) (except with client's consent after full disclosure, lawyer shall not accept employment if professional judgment on behalf of client will be or reasonably may be affected by lawyer's own financial, business, property, or personal interests).

In the referee's recommendations to the court, he noted both a complete absence of mitigating circumstances and Denton's refusal to acknowledge any wrongdoing whatsoever. Nonetheless, the referee determined that the totality of the circumstances did not warrant disbarment and recommended that Denton be suspended from the practice of law for 2 years, during which time he be required to participate in gender sensitivity classes and continue his own counseling for depression and anxiety.

## DETERMINATION OF SANCTION

The NSBA filed exceptions to the referee's recommended disciplinary sanction, but not to his findings of fact. Although Denton's brief disputes the referee's findings, Denton failed to file exceptions to the referee's report. Under existing case law, we are limited in our review to examining only those items to

which the parties have taken exception. See *State ex rel. NSBA v. Schmeling*, 247 Neb. 735, 742, 529 N.W.2d 799, 805 (1995) ("[i]n his brief, [respondent] raises other issues concerning the formal charges. However, we are limited in our review to examining only those items to which he has taken exception. Other issues discussed but not assigned as exceptions will not be considered"). Because Denton has not filed exceptions and the NSBA has filed exceptions only to the recommended sanction, we need not conduct a *de novo* review of the referee's findings of fact. Under the disciplinary rules, the court may, in its discretion, consider the referee's findings as final and conclusive. Rule 10(L) provides:

> Within ten days after the filing of the report of the referee, any party thereto may file written exceptions to such report. If no exceptions are filed, the Court, in its discretion, may consider the findings final and conclusive, and on motion shall enter such order as the evidence and law require.

See, *State ex rel. NSBA v. Schafer*, 227 Neb. 449, 454, 418 N.W.2d 228, 231 (1988) ("[p]ursuant to rule 10(L), the findings of the referee are accepted as final and conclusive"); *State ex rel. Nebraska State Bar Assn. v. Blanchard*, 179 Neb. 452, 454, 138 N.W.2d 804, 805 (1965) ("[t]he referee having found a violation of the cited canons, and no exceptions having been filed thereto, the findings are final and conclusive").

Since neither party filed exceptions to the referee's findings of fact, we consider them final and conclusive pursuant to rule 10(L). We therefore adopt the referee's findings and conclude that Denton violated DR 1-102(A)(5) (conduct that is prejudicial to administration of justice); DR 1-102(A)(6) (conduct that adversely reflects on his or her fitness to practice law); DR 2-110(B)(2) (lawyer shall withdraw from employment if lawyer knows or it is obvious that continued employment will result in violation of disciplinary rule); DR 5-101(A) (except with client's consent after full disclosure, lawyer shall not accept employment if professional judgment on behalf of client will be or reasonably may be affected by lawyer's own financial, business, property, or personal interests); and DR 7-101(A)(3) (lawyer shall not intentionally prejudice or damage client during

course of professional relationship, except as required under DR 7-102(B)).

We must now determine the appropriate disciplinary measure to impose upon Denton. To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, this court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the offender generally, and (6) the offender's present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Miller, ante* p. 181, 602 N.W.2d 486 (1999); *State ex rel. NSBA v. Johnson*, 256 Neb. 495, 590 N.W.2d 849 (1999).

To determine what sanction is appropriate, each case justifying discipline of an attorney must be evaluated individually in light of the particular facts and circumstances. *State ex rel. NSBA v. McArthur*, 257 Neb. 618, 599 N.W.2d 592 (1999). In light of the particular facts and circumstances of this case, there are three main considerations requiring disbarment. First, Denton knowingly took advantage of K.J.'s vulnerability. Second, Denton placed his own self-interest and protection above that of his client's. Third, Denton misrepresented the truth throughout this proceeding, as demonstrated by his implausible theories of defense.

TAKING ADVANTAGE OF CLIENT'S VULNERABILITY

The record shows that K.J. was particularly vulnerable at the time Denton solicited a sexual relationship with her. K.J. was in the midst of a divorce which involved a custody battle for her children. Although K.J. was awarded temporary custody, she was ordered to move out of the marital home.

Denton was aware of K.J.'s psychological state. When questioned about her problems, Denton stated that there were "numerous problems, actually. I do believe that [her husband] was browbeating her, that he was trying to drive her nuts, and as distraught as she was getting, he was having a certain amount of success." Denton assessed K.J. as being "very, very nervous — or appeared to be very nervous. She's a very high strung person, from all I can tell." In fact, Denton stated that sometime during

the divorce proceedings, he recommended that K.J. seek professional help. Furthermore, Denton encouraged K.J. to confide in him, and she did so, relying on him for support during this time.

When Denton began making sexual advances, K.J. did not object. When asked why, she testified:

> I don't know what was going on in my mind. I was so confused by everything that was going on. For a long period of time it kind of felt like being in a fog.
>
> . . . .
>
> . . . I don't know that I really understood what I was getting myself into. What I felt is this man is here for me, he takes the time to listen to me and my problems with [my husband]. He's willing to give me hugs, he's a caring person.

It is obvious that Denton deliberately took advantage of K.J.'s vulnerability and abused the attorney-client relationship for his own personal gratification. By exploiting the professional relationship, Denton caused further psychological harm to a vulnerable client. At the time of K.J.'s testimony in front of the Committee, she was still seeing a psychologist because of her relationship with Denton, among other things. Denton's abuse of the attorney-client relationship in K.J.'s case demonstrated that he placed his interest in sexual gratification above that of his client's best interests. K.J. had the right to expect adequate legal representation when she hired Denton, not exploitation of the attorney-client relationship and a further violation of her trust.

### PLACING DENTON'S OWN INTERESTS ABOVE THOSE OF HIS CLIENT

The referee found that the NSBA proved by clear and convincing evidence that Denton did not call certain witnesses *because of* their knowledge of his sexual relationship with K.J. By engaging in sexual relations with K.J., and then later refusing to contact potential witnesses who knew of the sexual relationship, Denton placed his own self-interest and protection above that of his client. In turn, this contributed to K.J.'s loss of custody of her children.

## DENTON'S LACK OF CANDOR

For purposes of determining the proper discipline of an attorney, the Nebraska Supreme Court considers a respondent's acts both underlying the events of the case and throughout the proceeding. *State ex rel. NSBA v. Miller, ante* p. 181, 602 N.W.2d 486 (1999); *State ex rel. NSBA v. Johnson,* 256 Neb. 495, 590 N.W.2d 849 (1999).

From the start, Denton adamantly denied the existence of any sexual relationship whatsoever with K.J. The evidence in the record, however, overwhelmingly indicates that a sexual relationship did in fact exist between Denton and K.J. Despite this evidence, Denton presented numerous implausible theories to show that he did not have a sexual relationship with K.J.

First, Denton claimed that he was impotent at the time of the encounters. He proffered medical evidence regarding his alleged impotency, and his wife testified about his professed condition. However, the affidavit and testimony of Jane Doe, another of Denton's former clients, convincingly shows that Denton misrepresented the truth by advancing the theory of his impotence. Jane Doe testified that on approximately four separate occasions, Denton held his pant leg up against his body to show her that he had an erection. She also testified that when she performed oral sex on Denton, it was quite obvious that he had an erection. From this testimony, it is clear that Denton misrepresented the truth when he presented evidence to the effect that he could not have engaged in sexual relations with K.J. because of his impotency.

Next, Denton offered unbelievable explanations regarding the taped conversation between himself and K.J. At the initial hearing before the Committee, Denton tried to explain the taped conversation by saying that he did not know what K.J. was talking about and that her questions were out of the blue. Denton made an implausible attempt to relate the conversation to the outcome of the divorce proceeding. Clearly, however, the taped conversation was not about K.J.'s divorce trial. Denton's explanations for his statements on the tape recording were neither convincing nor believable.

Moreover, Denton continues to deny the allegations of his sexual relationship with K.J., despite overwhelming evidence to

the contrary. In effect, Denton asks this court to deny the undeniable truth, which is that he engaged in sexual relations with K.J. and then refused to acknowledge any wrongdoing whatsoever. Denton has utterly failed to take any responsibility for his actions. This behavior demonstrates neither a present nor a future fitness to continue in the practice of law.

## CONCLUSION

Denton has exploited his client's emotional vulnerability and placed his own self-interest and protection above that of his client. His abuse of the professional relationship, his continual refusal to accept responsibility for his conduct, and his disingenuous behavior throughout the disciplinary proceedings render Denton unfit to practice law. Since there are no mitigating factors to consider, we conclude that Denton should be disbarred.

JUDGMENT OF DISBARMENT.

MILLER-LERMAN, J., not participating.